# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3402 | **DATE** | 6/25/2001 |
| **CASE TITLE** | DEBORAH A. HOWELL vs. THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's motion for summary judgment [16-1] is granted. Judgment is entered for defendant The Board of Trustees of the University of Illinois and against plaintiff Deborah A. Howell.

*Suzanne B. Conlon*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | | |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | | |

number of notices

JUN 2 8 2001
date docketed

docketing deputy initials

SB-7
FILED FOR DOCKETING
01 JUN 27 PM 7: 49

6/26/01
date mailed notice

p8
mailing deputy initials

sb

courtroom deputy's initials

Date/time received in central Clerk's Office

**Document Number**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DEBORAH A. HOWELL )
                                            )
                        Plaintiff,  )        No. 00 C 3402
                                            )
        v.                                  )        Suzanne B. Conlon, Judg
                                            )
THE BOARD OF TRUSTEES               )
OF THE UNIVERSITY OF ILLINOIS       )
                        Defendants.  )

**DOCKETED**
**JUN 28 2001**

## MEMORANDUM OPINION AND ORDER

Deborah A. Howell ("Howell") sues the Board of Trustees of the University of Illinois ("the Board") for race discrimination (Count I), retaliation (Count II), and constructive discharge (Count III), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). In addition, Howell sues for violations of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Count IV).[1] The Board moves for summary judgment, pursuant to Fed.R.Civ.P. 56.

## BACKGROUND

All facts are undisputed unless otherwise noted. Howell worked for the Board from 1983 until she resigned on August 17, 2000. During this time, Howell received two promotions. In May 1997, Howell began working as an Information Services Supervisor ("ISS") for the

---

[1]Howell's claim for violations of the Americans With Disabilities Act was previously dismissed. Howell subsequently amended the complaint to add a claim under the Rehabilitation Act.

-1-

University of Illinois College of Medicine ("the University"). She worked in the genetics division of the pediatrics department. Helen Akons ("Akons"), Barbara McInerney ("McInerney"), and Danya Hazeltine ("Hazeltine") also worked as ISSs in the pediatrics department. Howell and Akons are African-American. McInerney and Hazeltine are Caucasian.

Howell's ISS supervisor initially was Dr. Barbara Burton ("Burton"), the head of the genetics division. Howell performed general secretarial and clerical work for Burton, including answering the telephone, typing, filing, transcribing, and billing. Although regular working hours were 8:30 a.m. to 5:00 p.m., Burton permitted Howell to work from 8:00 a.m. to 4:30 p.m. This time schedule enabled Howell to pick up her granddaughter from a childcare provider. Burton gave Howell favorable performance reviews.

On April 9, 1999, Dr. George Hoganson ("Hoganson") met with Howell and explained that he would be replacing Burton as head of the genetics division in May 1999. Hoganson further informed Howell that her job responsibilities would change slightly and that she would be transcribing more clinical notes and interacting frequently with patients. In effect, Howell's workload increased under Hoganson's supervision because he saw more patients than Burton.

Later that afternoon, Howell called Nona Flores ("Flores"), the assistant head of the pediatrics department. Howell explained that she did not wish to accept the updated position because transcribing patient reports would send her into a deep depression. For the previous eight years, Howell had been suffering from mental impairments, namely a fear of dying in her sleep and a fear of diseases. In addition, Howell's father had become deathly ill shortly before her conversation with Flores. In response to Howell's job concerns, Flores stated that Howell could take sick leave if she obtained a formal medical excuse.

On April 11, 1999, Flores gave Howell a written job description. The updated version differed from the earlier one in that it required Howell to transcribe client notes from various physicians and other employees, update marketing information, and talk with patients about their condition. Howell was expected to use her judgment as to when Hoganson should be contacted regarding a patient's condition. The next day, Flores made an appointment for Howell with the University's health services. Flores wanted an evaluation of Howell's condition as to whether she was capable of performing her work duties. Howell's appointment was originally scheduled on April 16, 1999, but was postponed for a week because Howell's father died. Flores forwarded Health Services a copy of Howell's new job responsibilities on April 19, 1999.

On April 22, 1999, Howell met with Dr. Nicholas Borden ("Borden") because her psychological condition was deteriorating. This was the first time Howell sought treatment for a mental condition since she began working for the Board. Her fear of dying in her sleep was so severe that she was unable to sleep. In addition, she was afraid to leave her house, drive her car, or go near water. Borden diagnosed Howell with a panic and generalized anxiety disorder and prescribed medication. Borden did not consider generalized anxiety disorder to be a permanent condition and believed Howell could recover.

Even with medication, Howell only slept for approximately five hours a night, two or three hours at a time. As a result, she felt drowsy during the day. The parties dispute whether the medication fully alleviated Howell's psychological problems. Howell contends she continued to cry in the dark at home and had metal bars installed on her front door because she feared someone would break into her house.

After Howell went to her health services appointment, the agency sent Flores a work

status report stating that Howell was unable to work from April 23,1999 to April 30, 1999. On April 29, Health Services sent Flores a status report stating that Howell was unable to work until at least May 14, 1999. On June 28, Health Services sent Flores a report stating Howell could return to work on July 12. The report did not indicate there were any restrictions on Howell's ability to work. None of the status reports Flores received stated the reasons why Howell was unable to work.

When Howell returned to work without restrictions on July 12, her workspace was moved from the second floor of the Clinical Services North building to the first floor of the adjacent Clinical Science building. She was assigned a desk in Room 145, where the computer system for generating patient notes was located. Howell was informed that she could use this workspace unless Room 145 was already occupied by other clinical units. In the event that the assigned desk was unavailable, Howell was directed to contact Hoganson or his designate, who would determine whether an alternative workspace was available. After Room 145 was closed down in August 1999, Howell was moved back to her worksite prior to April 1999. Howell contends she was the only employee not given a desk, work supplies, or a place to sit.

The day Howell returned to work, Flores gave her a memo outlining her job duties. In addition, the memo noted that the job hours were from 8:30 a.m. to 5:00 p.m., but that Hoganson would allow Howell to leave at 4:30 p.m. for the first month after her return. The memo further stated that it would be decided in mid-August whether Howell could continue to leave early.

Four days after Howell returned from sick leave, Hoganson met with individuals in employee relations to discuss disciplining Howell. The Board contends that almost immediately upon Howell's return to work, there were concerns about her work performance. The Board

asserts Howell: (1) transcribed slowly and inaccurately; (2) refused to perform work for genetics division employees when she concluded the work was not in her job description; (3) failed to screen incoming telephone calls or direct them appropriately; (4) failed to maintain records and files properly; (5) failed to complete department purchase orders and vouchers in a timely manner; (6) failed to ensure proper maintenance of office equipment; (7) interacted poorly with clinic patients and (8) spent time working for other employers within the genetics division. Flores and Hoganson assert they believed Howell was capable of performing her duties because she was released to work without restrictions. Howell does not dispute that her job performance was impaired, but disputes the extent to which the Board claims she was impaired. Howell contends her job performance was affected by her disability, medication, and treatment. She claims she was given too much work in the time allotted, she was treated in an unfriendly manner by Hoganson, she was ignored or belittled by other employees, and she was not provided with essential resources. Howell complained to Hoganson on several occasions that she did not have the resources to fulfill her demanding work responsibilities. In addition, Howell told Flores on several occasions that she needed assistance with her stressful job and that she did not know how to fulfill her transcription duties.

On October 8, 1999, Flores gave Howell notice that she was required to attend a pre-disciplinary meeting on October 13. The notice stated the reasons for the meeting were: (1) insolent and insubordinate conduct; (2) failure to complete work assignments; (3) impeding the operations of the department; and (4) use of the University's time and equipment to conduct personal business. The meeting was limited to discussing Howell's performance after her return to work on July 12. During the meeting, Howell denied the substance of the charges against her

and stated that the support she received and her deadlines were unrealistic. She further requested that the position be reviewed. However, Howell did not request a formal audit of her civil service position, even though she knew this was the proper procedure.

As a result of the October 13 meeting, Flores and Hoganson issued Howell a letter of warning on October 15. In addition, Howell was notified in October that she would now be required to work until 5:00 p.m.

On October 20, Flores and Hoganson sent Howell notice of a second pre-disciplinary meeting that she was required to attend on October 26. The meeting was based on the same problems raised in the October 13 meeting. On October 22, Howell filed a charge of discrimination with the United States Employment Opportunity Commission ("EEOC") alleging that the Board discriminated against her because she is black.

During the October 26 pre-disciplinary action meeting, Howell contends she again denied the substance of the complaints against her and asserted that she was discriminated against because of race. On November 1, Howell received a disciplinary suspension notice based on the charges raised in the October 20 notice. She was suspended without pay for five days beginning November 8.

On November 5, Howell met with Gary Kombrink ("Kombrink"), the director of the University's department of human resources, and requested a Family and Medical Leave Act ("FMLA") application. Howell later returned the application to Kombrink. Howell was granted FMLA leave retroactively from November 5, 1999 until January 27, 2000. During Howell's leave, Flores sent her a memo discussing her job responsibilities. Howell showed the memo to her doctor, who advised she should consider part-time work. The parties dispute whether Howell

-6-

asked Kombrink if she could be considered for a part-time position. Howell applied for disability benefits and alternative full-time positions with the University during her FMLA leave. She was not contacted about any full-time positions.

In late December 1999, Howell attended her last appointment with health services. The examining doctor found her unfit to work for an indefinite amount of time. Health services declined to reinstate her for work on January 27. She remained a Board employee while her disability application was pending. On April 25, 2000, the State Universities Retirement System denied Howell's application for disability because she had not been disabled for sixty days. By this time, Howell was working full-time as a Conference Center supervisor for South Suburban College. Howell submitted her written resignation to the Board on August 17, 2000.

## DISCUSSION

### I.   Summary judgment standard

Summary judgment is appropriate when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *King v. National Human Resource Committee, Inc.*, 218 F.3d 719, 723 (7th Cir. 2000). Once a moving party has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56 (e); *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000). A genuine issue of material fact exists when "the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.,* 216 F.3d 596, 599 (7th Cir. 2000). The summary judgment standard is applied with special scrutiny to employment discrimination cases because the outcome often depends on determinations of credibility and intent. *Michas v. Health Cost Controls of Illinois,* 209 F.3d 687, 692 (7th Cir. 2000).

## II. Title VII claims

Title VII provides that "[i]t shall be unlawful employment practice for an employer . . . (1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . ." 42 U.S.C. § 2000e-2(a)(1); *Campbell v. Dominick's Finer Foods, Inc.,* 85 F.Supp.2d 866, 870 (N.D. Ill. 2000). Title VII further provides that employers may not discriminate against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); *Fyfe v. City of Fort Wayne,* 241 F.3d 597, 601 (7th Cir. 2001).

When a plaintiff attempts to establish discrimination with indirect evidence, courts have established a framework for allocating the burden of production between the parties and an order for presentation of proof. *Michas,* 209 F.3d at 692. The plaintiff must first make out a *prima facie* case of discrimination. *Id.* (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)). Once a *prima facie* case has been established, the defendant must offer a legitimate non-

discriminatory reason for the employment decision. *Id.* If the defendant can offer a non-discriminatory reason, the burden then shifts to the plaintiff to show the defendant's reason is merely a pretext for discrimination. *Id.* at 693.

### A. Racial discrimination

Howell relies on circumstantial evidence to establish that the Board engaged in racial discrimination by initiating disciplinary actions, suspending her from work, and treating her rudely. To make out a *prima facie* case of discrimination, plaintiffs typically must present evidence to show: (1) they are a member of a protected class; (2) they met their employer's job expectations to a reasonable extent; (3) they were the victims of an adverse employment action; and (4) the defendant treated similarly situated employees outside the protected class more favorably. *Russell v. Board of Trustees of the University of Illinois at Chicago,* 243 F.3d 336, 341 (7th Cir. 2001). It is undisputed that Howell is a member of the protected class and suffered an adverse employment decision when she was suspended from work for five days.[2] The Board contends Howell fails to present sufficient evidence to establish the second and fourth prongs.

The court will only consider whether Howell has offered sufficient evidence to satisfy the fourth prong. Analysis of the second prong is not necessary because the individuals judging Howell's job performance, namely Hoganson and Flores, are the same individuals she accuses of discriminating against her. *Oest v. Illinois Department of Corrections,* 240 F.3d 605, 612 (7th Cir.

---

[2]In regard to the alleged adverse employment action, the court will focus on the disciplinary suspension. *See Russell v. Board of Trustees of the University of Illinois at Chicago,* 243 F.3d 336, 341 (7th Cir. 2001) (five-day disciplinary suspension considered adverse employment action). No legal authority has been presented to suggest rude treatment is an adverse employment action. "Minor or trivial actions that make an employee unhappy do not constitute materially adverse employment actions." *Id.* (internal citations and quotations omitted).

2001) (second prong of *McDonnell Douglas* is not necessary when the individuals judging plaintiff's performance are the same people accused of discriminating against her) (citing *Flores v. Preferred Technical Group,* 182 F.3d 512, 515 (7th Cir. 1999)).

Howell offers her own affidavit to show that (1) the Caucasian ISSs had assistants to share their workload; (2) Hoganson was rude to African-American employees but not to Caucasian employees; and (3) Howell was not given her own workspace, whereas Caucasian employees had their own. This evidence standing alone is insufficient. "The removal of a factual question from the jury is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined either by other credible evidence, physical impossibility or other persuasive evidence that the plaintiff deliberately committed perjury." *S Industries, Inc. v. Stone Age Equipment, Inc.,* 12 F.Supp.2d 796, 810 (N.D. Ill. 1998) (citing *United States v. Kitsos,* 770 F.Supp. 1230, 1237 (7th Cir. 1991)). *See also Shank v. William R. Hague, Inc.,* 192 F.3d 675, 682 (7th Cir. 1999) ("Self-serving affidavits without factual support in the record will not defeat a motion for summary judgment"). Howell fails to offer evidence to corroborate her own self-serving statements, such as the testimony of other Board employees. Furthermore, the record casts doubt on her statements. First, there is evidence suggesting Haseltine, a Caucasian ISS, did not have regular assistance. Pl. Facts Resp. at ¶¶ 5, 205. Second, Howell admitted in her response to the Board's facts that McInerney, a Caucasian ISS, had to share her workspace with another employee and that sometimes McInerney's workspace was occupied by others. *Id.* at ¶¶ 19, 194. A party may not submit an affidavit to survive summary judgment that contradicts a prior admission without a good explanation. *Higgins v. Mississippi,* 217 F.3d 951, 955 (7th Cir. 2000). Howell fails to offer

any explanation for the contradiction. Therefore, her affidavit must be disregarded. *Id.*

Howell offers her own deposition to show Flores stated she would be glad when Howell got a new job. This evidence sheds no light on whether Caucasians were treated more favorably than African-Americans. In fact, there is evidence to suggest the contrary. Howell admits that Flores treated both Caucasians and African-Americans rudely. Pl. Facts Resp. at ¶¶ 5, 213. Read in a light most favorable to Howell, a reasonable jury could not find that she established a *prima facie* case of race discrimination. Even if Howell could establish a *prima facie* case, she could not prevail on her discrimination claim because she fails to offer sufficient evidence of pretext. "The mere fact that the employer acted incorrectly or undesirably . . . cannot adequately demonstrate pretext." *Tincher v. Wal-Mart Stores, Inc.,* 118 F.3d 1125, 1130 (7th Cir. 1997) (internal citations omitted). *See also Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1124 (7th Cir. 1994) (plaintiff must "produce evidence from which a rational factfinder could infer that the company lied"). Accordingly, summary judgment must be granted in favor of the Board on Count I.

## B. Retaliation

Howell contends her five-day suspension was the Board's retaliation for filing a charge of discrimination with the EEOC and for complaining about racial discrimination during her second pre-disciplinary meeting. In order to establish a *prima facie* case of retaliation, Howell must show: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. *McKenzie v. Illinois Department of Transportation,* 92 F.3d 473, 483 (7th Cir. 1996). "In order to demonstrate the causal link, she must demonstrate that [the Board] would not have taken the adverse action but for the protected expression." *Id.* (internal citations and quotations omitted).

Howell does not present sufficient evidence to establish "but for" causation. First, Howell offers no evidence the Board knew she had filed an EEOC charge when they suspended her. Second, evidence that Howell complained about racial discrimination at her second pre-disciplinary meeting cannot, without more, establish that the five-day suspension was retaliatory. "Speculation based on suspicious timing alone . . . does not support a reasonable inference of retaliation. . . . Rather, other circumstances must also be present which reasonably suggest that the two events are somehow related to one another." *Sauzek v. Exxon Coal USA, Inc.,* 202 F.3d 913, 918 (7th Cir. 2000). Howell fails to offer evidence to show the events are linked. In fact, the disciplinary proceedings leading to the suspension decision began *before* Howell filed her discrimination charges. Finally, Howell's admissions regarding her work performance discredit her contention she would not have been suspended but for her race. Howell admits her job performance was impaired in part by her psychological condition and medication. Pl. Facts Resp. at ¶¶ 105-121. In fact, medication caused Howell to be drowsy and even fall asleep once at work. Pl. Additional Facts at ¶ 29. Furthermore, she does not deny she exhibited "insolent and insubordinate behavior". She merely denies that such behavior was deliberate. Pl. Facts Resp. at ¶¶ 134-35. Similarly, she does not deny she made a large number of errors in her work. Instead, she suggests the number of mistakes she made was reasonable given the nature of her disability and the Board's failure to provide accommodations. *Id.* at ¶ 136. Even if Howell could establish a *prima facie* case of retaliation, she could not establish pretext. She has not presented evidence from which a reasonable jury could infer the Board lied about its reasons for suspending her. *See Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1124 (7th Cir. 1994). Accordingly, summary judgment must be granted in favor of the Board on Count II.

## C. Constructive discharge

To establish constructive discharge, Howell must show that working conditions were so intolerable that a reasonable person would have been compelled to resign. *Drake v. Minnesota Mining & Manufacturing Co.,* 134 F.3d 878, 886 (7th Cir. 1998). "Not only must conditions be intolerable; for a Title VII constructive discharge claim to succeed, they must be intolerable because of unlawful discrimination." *Id.* Intolerable conditions are more than ordinary discrimination. If subjected to ordinary discrimination, employees are expected to seek redress while still employed. *Id.*

Howell's allegations do not meet this high standard. Her evidence suggests she was forced to quit because health services found her mentally unfit to work, not because she was subjected to racial discrimination by her superiors or co-workers. Pl. Additional Facts at ¶ 42. Furthermore, as discussed above, there is no credible evidence that Howell was treated differently than white employees who were similarly situated. Evidence that Howell was subjected to unreasonable deadlines, insufficient workspace, and rude behavior may support a claim of intolerable work conditions but do not suggest conditions were intolerable because of racial discrimination. The case Howell cites in support of her constructive discharge claim is clearly distinguishable. In *Hunt v. City of Markham, Illinois,* plaintiffs' employers made repeated racist and age-related comments to or about plaintiffs for four years. 219 F.3d 649, 652 (7th Cir. 2000). The court found plaintiffs' working conditions were intolerable because they could reasonably conclude that remaining at their jobs would deprive them of a minimal sense of self-respect. *Id.* at 655. In contrast, Howell fails to offer evidence of even one race-based comment that was made by any Board employee. Summary judgment must be granted in favor of the Board with respect to Count

III.[3]

### III.    Rehabilitation Act claims

The Rehabilitation Act prohibits an employer who receives federal funding from discriminating against "a qualified individual with a disability because of that disability." 29 U.S.C. § 794(a). The Rehabilitation Act further provides that the standards used in Americans With Disabilities Act ("ADA") cases should be applied to determine whether the Rehabilitation Act is violated. *Id.* at § 794(d); *Silk v. City of Chicago,* 194 F.3d 788, 798, n.7 (7th Cir. 1999). The two statutes are distinguishable only in that the Rehabilitation Act is limited to programs receiving federal financial assistance. Therefore, the court cites ADA definitions and standards in determining whether Howell can establish a Rehabilitation Act violation. *See id.*

Plaintiffs who brings claims under the Rehabilitation Act can prove their claims by either direct or indirect evidence. *Id.* at n.6, 798. Howell relies on indirect evidence. Therefore, she must first establish a *prima facie* case of disability discrimination. If the Board offers a non-discriminatory reason for its actions, Howell must then establish that the Board's proffered reason is pretextual.

For her *prima facie* case, Howell must show: (1) she suffers from a disability; (2) she was otherwise qualified to perform her job; (3) she was involved in programs receiving federal financial assistance; and (4) she was subjected to an adverse employment action as a result of her

---

[3]Howell cannot establish a hostile work environment for the same reasons she cannot establish constructive discharge. *See Hardin v. S.C. Johnson & Son, Inc.,* 167 F.3d 340, 345 (7th Cir. 1999) (to establish hostile work environment, plaintiff must show harassment was "sufficiently severe or pervasive as to alter the conditions of the victim's employment and to create an abusive working atmosphere") (internal citations omitted).

disability. *Id.* at n.7, 798. The Board contends Howell fails to offer evidence to establish the first and fourth prongs.

## A. Disability evidence

A disability for purposes of the Rehabilitation Act is defined as: "(A). A physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); *Amadio v. Ford Motor Company,* 238 F.3d 919, 925 (7th Cir. 2001). It appears from the evidence presented that Howell seeks to establish the first prong.

Howell contends her anxiety disorder substantially limited her ability to work. Working is considered a major life activities for purposes of the act. *Mattice v. Memorial Hospital of South Bend, Inc.,* 249 F.3d 682, 685-86 (7th Cir. 2001). "When the major life activity under consideration is working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton v. United Airlines, Inc.,* 527 U.S. 471, 491 (1999).[4]

In an effort to establish she is unable to work in a broad class of jobs, Howell offers evidence she has suffered from a fear of dying since 1992 and a fear of diseases since the age of 17. Pl. Resp. at Ex. B., pp. 13-14. On April 22, 1999, Borden diagnosed Howell as having a

---

[4]Howell does not specifically allege her anxiety disorder substantially impaired her major life activity of sleeping. Instead, she asserts that her anxiety disorder affected her sleep, which contributed to her impaired ability to work. *See* Am. Cmplt. at ¶ 40; Pl. Resp. at pp. 7-8. This distinction is important for determining whether the court must address sleeping as a separate major life activity. *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 490 (1999). *See also Mattice v. Memorial Hospital of South Bend, Inc.,* 249 F.3d 682, 685 (7th Cir. 2001) (when plaintiffs specifically claim their disability affects major life activities besides working, other life activities cannot be collapsed into the ability to work analysis).

panic and generalized anxiety disorder and prescribed medication for her. *Id.* Depression is a potential side effect of this medication. *Id.* at p. 46. In addition, the medication only enabled Howell to sleep two or three hours at a time and approximately five hours total nightly. Pl. Resp., at Ex. A., pp. 203-205. Howell felt drowsy during the day and fell asleep at least once while working for Hoganson. *Id.* Even with the medication, she did not feel safe at home and feared someone would break into her house. Pl. Resp. at Ex. B., p. 23. Consequently, she installed metal bars on the doors and checked them four or five times within short periods of time. *Id.* Additionally, Howell offers evidence to show Health Services found her unfit to work on several occasions. Pl. Resp. at Ex. 5-8, 17.

Howell's evidence is insufficient for several reasons. First, although she claims to have suffered from irrational fears for many years, she presents no evidence she ever sought treatment prior to April 22, 1999. In fact, she admits she did not seek treatment between 1995 and April 1999. Pl. Facts Resp. at ¶ 231.

Second, Howell offers no evidence her mental impairment affected more than her ability to work for Hoganson. There is no indication that her mental impairment affected her job performance prior to the time Hoganson became her supervisor. Furthermore, Howell's current employer is fully satisfied with her work. Def. Facts at ¶ 227. In regard to her medication causing drowsiness or not fully alleviating her stress, this does not in itself show that Howell is substantially limited in her ability to work in a broad class of jobs. Howell's current employer testified she handles stress well and that falling asleep a couple times did not affect her ability to carry out her job duties. *Id.* Howell fails to point to any duties specific to a particular group of jobs that she cannot perform while drowsy or under stress. It appears her medication is easing any

-16-

anxieties that could potentially affect her work. Although Howell still has fears about her safety at home, she feels safe at work. Pl. Resp., Ex. B at p. 23. *See Krocka v. City of Chicago,* 203 F.3d 507, 513 (7th Cir. 2000) (ameliorating affects of plaintiff's medication must be taken into account when determining whether a mental impairment substantially limits a major life activity).

Finally, although it is true that Health Services found Howell unfit to work on several occasions, she was released to work without restrictions on July 12, 1999. A release without restrictions is compelling evidence that she was not substantially limited in the major life activity of working. *Brookins v. Indianapolis Power & Light Co.,* 90 F.Supp.2d 993, 1002 (S.D. Ind. 2000). Additionally, Borden reported that Howell showed "marked improvement" after drug therapy and a few therapy sessions. Def. Facts at ¶¶ 232-37. Howell has only suffered one relapse, which occurred in November 1999 after she failed to take her medication. Borden testified that failing to take medication could aggravate a patient's condition. *Id.* at ¶ 239. Moreover, Howell has not visited a mental health care professional since September 15, 2000. *Id.* at ¶ 243. Based on this evidence, no reasonable jury could find that Howell's mental impairment substantially limited her ability to work in a broad class of jobs. At most, the evidence suggests Howell could not handle the stress of working under Hoganson. *See Schneiker v. Fortis Insurance Company,* 200 F.3d 1055, 1062 (7th Cir. 2000) (a plaintiff who can do the same job under another supervisor can do the job for purposes of the ADA).

### B. Adverse employment action evidence

"An employee has the initial duty to inform the employer of a disability before ADA liability is triggered for failure to provide accommodations." *Hunt-Golliday v. Metropolitan Water Reclamation District of Greater Chicago,* 104 F.3d 1004, 1012 (7th Cir. 1997). To

establish the Board's notice of her disability, Howell testified that prior to taking sick leave in April 1999, she told Flores that she was under the care of a doctor for an anxiety disorder and that she was unable to work in her new position. Pl. Resp., Ex. A. at pp. 95-97. However, Howell offers no evidence suggesting she gave Flores any medical proof of her condition or gave her any reason to believe it was a permanent disability. There is no evidence that Howell told Flores that she was still suffering from an anxiety disorder upon returning to work in July 1999. In fact, the Board points out that Howell was released to work without restrictions as further evidence that it had insufficient notice.

Howell contends she informed Health Services of her disorder and provided the agency with information from her treating physician. However, Howell fails to provide any evidence of the information provided to Health Services. She merely offers the FMLA form that Flores signed in November 1999, which approved leave *contingent upon eligibility.* The form indicated that Howell believed she was suffering from a serious illness. *Id.* at Ex. 19.

Additionally, Howell points to the fact that Health Services notified Flores on several occasions that Howell was unable to work. However, the reports Flores received did not specify the reasons why Howell was unable to work. *Id.* at Exs. 5-8, 17. It was Howell's duty to supply that information.

Finally, Howell points to the fact that when she returned from sick leave in July 1999, she made requests for clarification of her responsibilities, assistance with her duties, and part-time work. She also applied for other positions within the University. *Id.* at Ex. A., pp. 124-25, 193-95. Even if these requests constitute requests for reasonable accommodation, the Board cannot be held liable for failing to comply when there is no evidence that Howell provided adequate

disability notification. Because Howell has failed to satisfy two of the elements of a *prima facie* case, summary judgment must be granted in favor of defendants with respect to Count IV.

## **CONCLUSION**

The Board's motion for summary judgment is granted.

ENTER:

Suzanne B. Conlon

United States District Judge

June 25, 2001